Next case is Mathis and Sons v. Workers' Compensation Commission, 510080. Counsel, please. Thank you. Brad Elwood on behalf of Mathis and Sons, we're the economists. We're asking that the majority's decision be reversed and that the decision of the arbitrator be reinstated. The two issues that we have before the court today are causation with respect to the low back and the issue about the referrals. And I'd like to start with the causation issue. The commission majority in its decision placed emphasis on two points. One, it found the petitioner to be credible, and two, it relied on the medical opinions of Dr. Gornett. And I'd like to start with Dr. Gornett's testimony, because I think that really addresses the credibility aspects as well. We have a case here where we have a petitioner with a longstanding low back problem. He has repeated and recurrent events of flare-ups, and they're all triggered by bending, stooping. At one point there's a reference to lifting a grandchild, which I think all of us know when you lift a child you're doing the same type of bending, stooping activity. In March of 2007, the petitioner had another recurrence of the low back problems and went to see his doctor, Dr. Bradley. He didn't report any type of work event, any type of work action. He reported a recurrence in events, was scheduled to come back in about two weeks. He comes back in two weeks on March 24th and makes reference to the fact that he had bent over the day before and had trouble getting up. He makes no reference to work. You'll note that the petitioner is alleging a work accident of March 22nd. And I mention this issue because it's important. What we have here is we've got events that take place, we've got medical treatment, chiropractic treatment that takes place, claims of recurrent low back pain prior to the accident, a schedule of an appointment that falls on two days after the alleged accident, but there's no mention of that appointment of any type of work injury or any type of work problem. Now, I'm going to jump ahead to Dr. Bournette's testimony because, like I said, the commission majority placed great reliance on his testimony. He did give a causal connection opinion. He did in his direct examination, exactly. And my point on that is this. He offered that testimony in his direct examination, but the commission completely ignores everything that transpired in the cross-examination. Now, normally we have a situation where the doctor will offer a causal opinion, the other attorney will ridicule it, try to put holes in it, and then we'll have a recross that comes back where the deposing attorney then says, you know, doctor, even though they said all those things to you and you had all this opinion, nevertheless, you still think there's a causal opinion. We didn't have that here. What we've got is the doctor testifying, counsel leaves. There wasn't any recross. Exactly. There wasn't any redirect. Mr. Rich left the telephone line for cross-examination on that. That's exactly correct. Yes, sir. That's exactly correct. And the importance of that is this. What that cross-examination shows us in this case is that Dr. Gornett did not have a complete understanding. He didn't have an understanding of this petitioner's background. The things that he was told by the petitioner were not correct. They were inaccurate. And when counsel walked through the prior medical with the doctor and referred to the chiropractor, Dr. Bradley's notes, the other medical doctor's notes that took place, and gave Dr. Gornett an opportunity to take a look at all these, then we said, well, what did the doctor say about these records? He says, one, I don't see anything in these records that you're showing me that indicate that there was a work accident, that there was anything tying these complaints of the low back problem to an event of March 22nd. And he says that to the extent that there were complaints with respect to the lower left extremity, that doesn't begin until April 16th. Now, remember, the commission majority says one of the things that we find significant is that he had immediate pain in his lower left extremity after this March 22 event. That's not what the record supports. And the doctor's review of those records confirms that in his deposition. But I think after we look at the examination that walked him through all the documents that said, the types of problems that you're seeing in these records, Dr. Gornett, are those consistent with the problems he had prior to March 22nd? And he says, yes, they are. They're the same type of problems. They're recurring. And he also comes back and says, when I review this information, I see no records of any type of work injury on March 22nd. He says, these records are inconsistent with what the petitioner told me happened to him. And when you look at page 51 and 52 of the doctor's deposition, and I apologize, they don't have C-sites. I'm going to start doing that, writing these down, so I have these in the future. But Dr. Gornett's deposition, pages 51, 52, and 55, he's asked, we assume what's in these records from Dr. Bradley and the other doctors are accurate. What does that say about whether this accident is related to an event of March 22nd? And he's asked that a couple times. He's hesitant to answer. But he says, well, clearly there's a discrepancy with this that you'll have to have the arbitrator in this case clarify. But there's clearly a discrepancy between what are in my records and what he told me and what is in these records. And he's asked on page 51, would you agree there's no basis to relate his back problems to that injury of March 22nd, 07? And he says, I would state in this record here, in this medical record, as he says, medical record independent, there's no basis to relate that. He's asked the same question. He based his opinion on the history given by the patient. Absolutely. And rendered his opinions on that. Absolutely. Then on cross-examination, in the absence of other counsel, you're certainly going to cross-examine the position, you limited him in a hypothetical question to considering very specific things and said, now, if you just look at that doctor, what does that tell you? And he gave some opinions based on your hypotheticals, right? That's correct, he did. And he was asked on page 52, again, to take a look and to assume that the information in the record that he was being asked to review were correct. And he says, there's nothing I see in the records that attribute his onset of his symptoms or increase in symptoms to a work-related accident of 3-22, which is in direct conflict with my records. Just to put it in a nutshell, you ask him, if you only consider these records where he doesn't report any work-related accident, what's your opinion on causation? Yes. If I only consider that, then I don't see a work-related accident in those records. Right, and what we were trying to do is establish that if that information was true, which the records are the records, there's nothing to indicate that the records are not true. And clearly, he saw these physicians, clearly these comments were made to them, or the lack of any reference to a work-related accident. So when the doctor was given the full opinion, he sees a different story. And I think it's interesting, when I read this deposition the first time, what caught me about this is I could almost see, I didn't take it, but what caught me is I could almost see a light bulb go over the doctor's head and go on at some point. Because he starts out the deposition confident, and he's given his answers, he makes his own ask-and-answer objection at one time, and he's going on. Well, as more information starts to come out, you can kind of see the doctor just, I think, you can see him shriveling in this case. I think he realizes exactly what's happened, he's been had, he hasn't been given the full story in this case. And I think when we look at the medical, with respect to what happened, we tried to outline this at pages 22 to 24 of our main brief. Just a quick summary for the report of what was told to Dr. Briley, what was told to Dr. Briley, what was told to Leanne DeNeal. This does not show a work-related accident. At most, it shows a gentleman who bends over and has difficulty getting up. And this reminds me of an analogy to a situation where if an individual is at home minding their own business, and they do something, and they damage a rotator cuff. Say they tear the rotator cuff. That person goes to work the next day and has to move a file around on their desk as they reach for it. Oh, my arm. Have they had a work-related accident? Or is it a symptom of the fact that they hurt themselves at home? I think it's a symptom of the fact that they hurt themselves at home. Well, how do you distinguish them and define pre-existing injury cases? You know, there's a theory of recovery, as you know, in a CISPR case. It says when you aggravate a pre-existing condition at work, it's still compensable, correct? Yes, under certain circumstances, I agree with you. I would say here what we have is, at most, we don't have an accident which to put into the pre-existing event aggravation analysis. All we have is an activity that generates a symptom that's related to a condition that this person has. I think there's a difference. Again, I go back to the shoulder injury. The fact that my shoulder hurts whatever I do and I do something at work that causes it to hurt doesn't mean I've hurt myself at work and it doesn't mean I've aggravated myself. Now, to tie in later, you'll notice this. No, we treat for just simple pain. Pardon me? We treat people just for pain. We treat people just for the symptom. Yes. Don't injured workers get to recover if the injury is aggravated by something that they do at work that causes pain for which they receive treatment? Or your theory is it's not compensable because it's only a symptom? Yes, I think it's not compensable in this case because, at most, it's only a symptom that he experiences at work, just like he would in any other aspect of his life. He bends over. We know bending over, whether he's at work or not, is going to cause him to elicit pain. Now, I make a point here. You both ask excellent questions. When we look at what this gentleman testified to, once he goes and sees his attorney and once he goes to see Dr. Gornett, now, I think if you were to believe what the petitioner says as this elaborate, I had to bend over, I had a shovel, I was doing all this stuff under the truck to knock the mud out. There's no dispute that those were part of his job, that part of his job, that mud gets in the rollers and if you're a crane operator, you have to get down out of the cab and clean the mud out at times. He did that. I think he testified that that was part of his job, but the question is, what was he doing? On that particular occasion, but there's no dispute that doing that was part of his job. I think that the record shows that that was part of his job, yes. And in order to see if there's mud under there, he had to get down and look under the crane, right? All those things were part of his job. Absolutely. The question is, if he's just bending over versus doing the elaborate activities that he started to testify to with Dr. Gornett, I mean, I think if we had a consistent record of what he told Dr. Gornett going back to March 22nd, we'd have a different situation, then we would come in and we'd say, even if he has a pre-existing condition, if he does those types of things, that's going to be an aggravation. I lose that case every time. And why is that the case, sir? Because he's not doing that. We don't have a history when we look at the medical records that were concurrent with the alleged injury and the medical records that come from about a month, month and a half after that time. We don't have any event at work that he testifies to other than the fact that he bends. Well, why does it have to be, as you said, a specific event or a specific action if he has a pre-existing condition and part of his job duties are to do something legitimately as part of his job description, and he does it and he just gets paid, why is that not compensable? Why do you have to have a specific traumatic injury or event? Well, he has to have an accident that arises out of it in the course of his employment. And I think as part of the accident analysis, unless I have it wrong, he has to do something that creates a risk that's inherent in employment, and simply bending is an activity that we all do. Wait a minute, wait a minute. Simply bending is an activity that we all do. But if you start out with a man with a bad back and you require him to bend at work, are you telling me that you don't think that's compensable, regardless of where the bad back came from? Well, I think in this case, we don't have the testimony of an accident. I think if all he's doing is bending, and we don't even know until later. Now, granted, we have the testimony about what the general duties are. But what they're asking us to do is say, well, we have the general duty testimony, coupled with the fact that he testified he bent over at work, and then later he tries to add to it, I bent over at work looking under my truck, and then later he adds to it, I bent over at work looking under my truck to take the shovel and clean the mud. I mean, this is the procession that we're talking about here. And if all we're looking at is, this is what we're looking at. Simply bending over, we don't have any description in the early time when he starts talking about bending over to look under the truck. What he was doing, we don't know what he was doing. We don't know how frequently he does that. We don't know if it was to look under, to do something with the mud. We have no idea what this guy was doing. And I think that's important here because, again, we look at the transition of what he says. No reported injury, bending. Let me just stop you there. Ruth Mathis, the employer's owner, testified that he came to her office that day and told her that he looked underneath the crane. He didn't just say, I bent over. He said, on the date of the alleged accident, he told her he bent over to look under the crane. Bent over and he could not get back up. That's what I had. When I reviewed the testimony and I compared Ruth Mathis' testimony to what the commission put in, it didn't match. Just a second, if I might. And then Mark Mathis, a week later, he was told he bent over and couldn't straighten up. That's correct. Page 91-92. He just said he had back trouble and he wasn't going to be able to work. I don't recall, here it goes. I think he said he had bent down and couldn't get back up. That's it, yes. That would be Ruth's testimony on page 92-93 of the transcript. I'm sorry, this is Mark's. I don't recall that Ruth said that he was bending under and working. I think the commission took some liberties with what she said. I'm sorry, I can't find that. I'm pretty sure that's what she said. I'll find that, what we're saying now. All your time is up. Your time on rebuttal. Thank you. Counsel, please. Justices, counsel, my name is Christy Cookson. I represent Mr. Wright. To save some time on rebuttal, page 84-85. You don't get any rebuttal. For him, on rebuttal. That was very nice of you. Yeah, save it for him. You appreciate that, don't you? I'm going to go ahead and quote from Ruth Mathis' testimony. Do you recall seeing Mr. Wright that day? Oh, I'll start. Were you working on March 22nd of 2007? Yes, sir. Do you recall seeing Mr. Wright that day? Yes, sir. Did he have any discussions with you at that time about having any injuries or physical problems? That was the day he came in and said he bent underneath the crane and hurt his back. What exactly did he say, page 85? He said, I got down off the crane, looked underneath the crane, and I couldn't get back up. That's exactly what he said. So, we're not talking about a little crane. We're talking about a crane that would fill this room. And there's no dispute that this crane, when it was operated in the winter on mud, would get all sorts of mud collected under the rollers. And that in order to operate that crane effectively, this was part of Mr. Wright's job duties. Mr. Wright always said that he was on the crane, he got off, he was looking under the crane, and why else would he be looking under the crane but to make the crane operable for work. That's what he was doing that day. She testified to that, and then Mark Mathis testified that about a week after the accident, the petitioner told him that he injured his back while bending down at work. So we have two reports, the day of, within the week, to two different people saying that this is exactly how this accident occurred. So you think you've met the arising out of standard? Yes, I do, Your Honor. I think that this is not a typical thing. He's been a heavy equipment operator for this company since the year 2000. Yes, he had a pre-existing back condition. He's been very candid about that. But on this day, getting down off of a crane that would fill this room, to look under it, to examine it for mud and to clean it, I think he credibly testified that that is what caused his back pain. Not only that, but respondents and witnesses said he's a good worker. He's a credible man. In fact, Mark Mathis characterized the petitioner as an honest individual and even a friend. But that isn't really the issue. It's whether he's telling the truth. I think it's an issue raised by respondents. Well, it's whether the statements go to something that's unique to this employment, something beyond what the ordinary public is exposed to. Did it arise out? Yes, it did arise out of an endorsing scope of the employment. And I think that's borne out not only by petitioner's testimony, but by respondents' witnesses, by the reports to the doctors, as well as by Dr. Vornad's causation opinion. Mr. Mathis had prior work comp claims that he didn't report. That's well borne out in the record, and that's not something I need to bring up here, except for the fact to show that he said, I had good insurance, I got treatment on my own. So he told them what happened. He told them about his accident at work, and he continued to try to get treatment. But guess what? This time it was a lot worse. And so eventually he called Ruth Mathis, and she testified to this and said, I need to fill out work comp papers. Now that happened a little bit later, but when did it happen? That was a big contention for a respondent in their brief. They say that there's no history of this work accident anywhere in the records, until he saw an attorney. Well, that is not the truth. Well, there's more than one, but I'm going to direct you to May 2, 2007, when he went to his primary care physician. This is the history he gave. The patient states he was bending over at work to look under a tractor, and could not straighten up. This was the 1st of March, 2007. Two years ago he had some similar back pain, which improved with chiropractic care. He has had some decompression with a chiropractor for the past 6 to 8 weeks, which has not improved his pain. That was before any attorney was involved. That was before any referrals were made. That was his primary care physician. He went and gave the history of the work accident, explained exactly how it happened, consistent with all the other testimony. And she referred him, well, it was actually the PA, referred him for an MRI, which showed some significant problems. The next thing that happened, I needed to fill out work comp papers. This is bad. What did Dr. Gornett say after looking in his back? Dr. Gornett said there were two free fragments found during surgery that could not have been there for a long period of time, because those are the type of fragments that have been well reported on in the literature that would dissolve over time and would not remain in position. Smaller protrusions can remain for quite some time, but large free fragments generally do not. And the fact that his symptoms dramatically improved with the removal of that all would be consistent with one temporal point in time in which this began. And so Mr. Reitz reports to his employer twice, three times in fact, twice to Ruth Mathis and then once to Mark Mathis. His reports to his doctors. And there was more than just that. He also indicated that to Dr. Park when he saw her before any consultation with an attorney, that guess what? This happened at work. So this is something that he always said happened and how he said it happened. Now granted, I get clients in my office all the time, I fell at work, I want to file a claim. And the first thing you have to ask them is, why'd you fall? How'd you fall? What happened when you fell? What were you doing at that time? Was there anything on the ground? Were you carrying anything? And that's how you decide when you're going to take the case. They say, I fell, I got hurt, I got hurt at work, it's compensable. We all know that's not the case. That's what happened in this case. Mr. Reitz always gave a consistent history of what happened in his work injury. More details came out, but it was always the same history. And nobody rebutted that at arbitration. He was found to be credible not only by the commissioners who decided this case, but also by his employers. Can I get you to switch gears a bit? To the report. When he saw Dr. Garnett the first time, was that before or after Dr. Riley made the referral? That was after. But the appointment, I believe the evidence... I understand. The appointment was made before. But he actually saw Dr. Garnett for the first time after Riley made the referral. Yes, Your Honor. And that appointment came after the referral. And just briefly, I would make the argument that we all ask people for counsel, whether it be our attorney, another physician, our next-door neighbor, our parents, our child. What do I do in this situation? It was clear he was having significant problems, severe pain. His doctor was out of town. What do I do? We found a doctor that was able to treat him. He went back to his doctor and asked if he would approve the referral. His treating doctor could have said no. If he would have said no, guess what? We can't go see that doctor, and you're going to have to go with whoever he refers. His doctor said yes, made the referral. He went to Dr. Garnett. That is within the chain of referral. I submit it's no different than if I said I asked another doctor friend, I asked my neighbor, I asked my mother, I asked someone else, and they said this doctor could treat me, and they were good. I've had my doctor make referrals, start asking around about the doctor, call up and say, guess what? I don't like his reputation. I want to go here, I want to go there, and this is the reason why. I submit that this is no different. Dr. Riley made the referral. He wouldn't have had to, and he made that referral based on the needs of his patient. Well, as a matter of fact, the first appointment was with Dr. Park, and Dr. Park scheduled the surgery, but Dr. Park was going on vacation, so it was going to be more than a month. Isn't that what the records reflect? Well, I think the surgery record was recommended. It was not scheduled. Tried to get back to see him. Well, he's out of town for a month. We're not going to be able to get to you until now. Now what am I going to do? Because I'm not getting any treatment. I'm miserable. Well, in any event, Dr. Park's records reflect that when he was called back about the surgery, what Dr. Park's office was told was, I got another doctor because I was in so much pain I couldn't wait that long. Yes, Your Honor. Isn't that what Dr. Park's records reflect? That is, and I submit that if anybody wasn't able to treat me and I was in a lot of pain, I would start asking around, and that's no different in this case. So unless there are any further questions, I would just ask that the decision of the commission and the circuit court be affirmed. Thank you. Thank you, Counselor Rubello. Just briefly. Counselor, let me ask you, what's wrong with the petitioner's attorney helping his or her client pick out a doctor? The act says you get the emergency room plus two choices and all referrals that come from those. The legislature has decided that they're going to place some limit on what the employer is responsible for,  and then call a doctor and backdate. Okay. Dr. Riley did make the referral, though. Yeah. Do you agree with that? Oh, yeah, he did. Who is, let's find the name here, Yvette somebody, Yvette Hastings? That name, obviously, doesn't ring a bell. I mean, Dr. Riley's records just show patients referred to Dr. Gornett, then Yvette Hastings calls and says, insurance isn't going to pay for that because he was already referred to Dr. Park, blah, blah, blah. That's what's in the records, right? I don't recall that, honestly. I don't. I don't. Well, Counselor, doesn't the Elmhurst-Chicago Stone case allow specifically for that, even though the attorney initially referred, the claimant's attorney referred the claimant to the doctor. Once the doctor himself follows that up with a referral, isn't that sufficient under the Elmhurst case? I'm drawing a blank on Elmhurst. Otherwise, I'd answer that specifically, and I apologize. In Elmhurst, the employer argued that one of the claimant's treating physicians was the claimant's third doctor of choice because his wife recommended the physician, which prompted the claimant to ask his treating physician for a referral, which is done what the treating physician did. And the court found that the doctor was in the chain of referral because the Well, I think there's a difference between a wife saying, you should go see this person, and then the individual going to the doctor and saying, my wife thinks I should see this person, and the doctor says, okay. Then the attorney says, no. The doctor is ultimately making the referral in both instances, isn't that? Yes, it does. But in the case that we have here, when we see a record that says patient informs us that his lawyer had arranged the appointment and everything was taken care of, they just need the referral. That's the record I'm talking about. That's all in response to somebody named Yvette Hastings calling the doctor to question about the referral. That doesn't appear in the records until Yvette Hastings, whoever she is, I suspect, somebody involved with the insurance company, calls the doctor to question about, you know, the referral. I think that I mean, up until then, there's just a note that says patients referred to so-and-so. This is like a day or two later when that To me, this seems to be an extension of the point of the individual appointment. When the counsel makes the appointment, that's no different than the individual going out and getting the appointment and then coming back and saying, by the way, I have an appointment lined up with this doctor. Would you go ahead and make the referral? What's wrong with that? Because the act has a system that we're supposed to follow. No. As long as he gets the referral before he sees the doctor, and that's why I asked the question, he's within a chain of referral because the service is being provided after the referral. If the service is provided before the referral, then in that particular case, your argument may hold some weight. There is no backdating of anything here. I think it's manipulating the system. I think it's classic manipulating the system. Surprise, surprise, surprise. I think we need to teach this counsel this power. We're just heading down the wrong slope. That's my opinion. I think that's why we read this. Well, I mean, there actually is evidence in this record, though, that the claimant was unhappy that he was going to have to wait so long to see Dr. Park. I mean, that's what Dr. Park's records show. I mean, we don't know, in fact, what happened. He called the attorney and said, can you get me in to see somebody faster? I'm in pain. What would be wrong with that? I think if he calls his – well, we've talked about the case in our reply brief, and I think there are some circumstances. I don't see that record created here, and that's why we're saying that this is not such a claim. Thank you. Thank you, counsel. The court will take the matter under advisement for disposition.